M'Donald v. Walton.

(48)                    M'DONALD, ADM'R., v. WALTON.

1. By the laws of Kentucky, regulating descents and distributions, slaves are held to be real estate; and for want of issue of the intestate, of father, mother, brothers, sisters and their descendants, if there should be no paternal or maternal kindred capable of inheriting on the one side or the other—the whole goes to the wife or husband of the intestate.
2. Slaves belonging to the estate of deceased persons, go to the administrator, to be by him disposed of as the law directs.

APPEAL from St. Louis Circuit Court.

TOMPKINS, J., delivered the opinion of the Court.

McDonald sued Walton in an action of detinue for some slaves. At the March term of the year 1827, judgment was rendered for Walton in the Circuit Court. McDonald appealed to this Court, and at the May term of the same year, the judgment of the Circuit Court was reversed, and the cause sent back to the Circuit Court for further proceedings. At the November term of the Circuit Court for the same year, judgment being again given for Walton, McDonald appealed to this Court. The facts as they now appear in the bill of exceptions, are as follows, viz:—In the year 1805, Daniel Polk or Pogue married Rebecca Walton in the State of North Carolina; before and at the time of the marriage, Polk was possessed of certain slaves, mentioned in the bill of exceptions, and for which slaves and their descendants this action was brought. Shortly after their marriage, Polk and his wife removed from North Carolina to Kentucky, and settled on an Island in the Ohio river, taking said slaves with them. In January, 1807 or 8, said Polk died intestate at his residence in Kentucky, and about the last of February or the first of March, next thereafter, his widow left Kentucky, and came to Upper Louisiana, now Missouri, bringing with her the said slaves, and one other, born in Kentucky, of the first mentioned. Polk had no children, and at the time of his death, no family living with him except his wife and slaves. In the month of April of the same year, the widow intermarried with one Absalom Chapman, a young man without property. Soon after their marriage, Chapman and his wife went to Kentucky on a visit, and after an absence of a

M'Donald *v.* Walton.

few months, returned and settled at Point Labbadie, in St. Louis county, having said slaves in their possession. After being there something more than a year, they removed said slaves to the lower country to some place unknown, either in the Mississippi or Orleans territory. A few years afterwards, in the year 1815, Chapman and (49) his wife returned to St. Louis county, bringing with them the said slaves and their increase, and remained in possession of them till 1817, when Chapman died, and a few months after, Rebecca, his wife died. The plaintiff proved, that on the 19th June, 1826, he obtained letters of administration on Polk's estate, in St. Louis county.

Chapman appointed the defendant, Walton, his executor. Walton proved the will and took on himself the execution thereof, as executor, and took possession of said slaves and their increase, and continued to hire them out, as executor, until the year 1823, when he settled his testator's estate, and continued his possession of said slaves, as guardian of the infant children of Chapman and said Rebecca; and in that character hired out said slaves from year to year, till September, 1824, when he delivered to William Melton, husband of his ward Narcessa, daughter of Chapman and wife, a part of said slaves as his portion of Chapman's estate; the defendant continued to hire out the remaining slaves till September, 1825, when he hired one of them to McDonald, the plaintiff, and two to one Waldo, neither of which have been returned to the defendant, and they are all three now in the possession of the plaintiff in this action, appellant here. The remaining part of said slaves are still under the defendant's control, and hired out by him. Chapman and wife, before they departed hence for the lower country, expressed much uneasiness lest these slaves should be set free under Polk's will, about which there was much talk. When Chapman and wife lived in Point Labbadie, there were but few families in the Point, the settlement being on the frontier. Polk had been heard to say, before he was married to Rebecca Walton, that he had no relations in America known to him; it was also in evidence, that said Rebecca, soon after Pogue's death, and before her removal from Kentucky, had been heard to say, "that she was much afraid that said slaves would be taken away from her, as Polk had, in his life time, made some arrangements with a man at the Red Banks about keeping or taking care of said slaves after his death," and gave this as a reason for her removal from Kentucky with said slaves. Some Kentucky statutes were read in evidence, which will be noticed hereafter; and no other evidence, material to be here noticed, was offered. The defendant prayed the Court to instruct the jury: First. That if the jury find, from the evidence, that Polk died intestate in the State of Kentucky, in 1807 or 8, without any issue or other descendants, and without leaving any father, mother, brother or sister, or their, or either (50) of their descendants, and without leaving any paternal or maternal kindred capable of inheriting, the whole of said slaves which belonged to said Pogue, and which he had with him in Kentucky at the time of his death, descended to Rebecca his wife, as his heir at law. Second. If the jury find, from the evidence, that Rebecca, widow of Pogue, was entitled to the slaves of which Pogue died possessed, and that said Rebecca and those claiming under her, have been in the uninterrupted exclusive possession of said slaves, under a claim of title adverse to all other persons, for a period of fifteen years consecutively, they ought to find for the defendant. To which instructions the plaintiff objected. The Court gave them as requested. The plaintiff then prayed many instructions, three of which, only, will be noticed, the rest being substantially contained in those three: First. If the jury find, from

the evidence, that Pogue died intestate in the State of Kentucky, in the year 1807 or 8, without any issue or other descendants, and without leaving any father, mother, brother, sister, or their or either of their descendants, and without leaving any paternal or maternal kindred capable of inheriting, yet the wife of said Pogue, and those claiming under her as her descendants, are not heirs at law of said Pogue, and cannot take, as heirs at law, any property, real or personal, left by said Pogue at the time of his death.    Second.  That no length of possession of Pogue's negroes, and their descendants since his death, by Pogue's widow and those claiming under her, before administration on said Pogue's estate, can confer a right of property in said negroes in said widow and her representatives, and those who claimed under her.    Third. That notwithstanding the jury may find, that Mrs. Pogue, widow of Daniel Pogue, and those claiming under her, are the heirs at law, under the laws of Kentucky, still, this will not operate as a bar to the plaintiff's right to recover in this action.    These instructions were refused.  The points growing out of these instructions, and which only it seems necessary to decide, are:  First.  Whether Mrs. Pogue, widow of the intestate, afterwards married to Chapman, could, by the laws of Kentucky, take the negroes by descent from her husband, in case there were at the time of his death, no father, mother, brother or sister, or their or either of their descendants, and no paternal or maternal kindred capable of inheriting from Pogue'  Second.  If there were no such person capable of inheriting from Pogue, and the wife took by descent, whether she or the administrator be entitled to the slaves.    Third.  Whether the administrator be not barred by the length of the defendant's possession, even should he be entitled in the first place, to the slaves to be administered on.

First.  Pogue died in Kentucky, and all his property must be distributed agreeably to the laws of the country where it was at the time of his death; it was in Kentucky when he died, and must then be distributed according to the laws of that State; and by the 28th section of an act of the General Assembly of the State of Kentucky, passed 8th February, 1798 :—All negroes, &c., shall be held, taken and adjudged to be real estate, and shall descend to the heirs and widows of persons departing this life, as lands are directed to descend in and by an act of the General Assembly, entitled, " an act directing the course of descent."  By the 14th section of which act it is provided, that where for the want of issue of the intestate, of father, mother, brothers, sisters and their descendants, *if there shall be no paternal or maternal kindred,* capable of inheriting, on the one side or the other, the whole shall go to the wife or the husband of the intestate;" both sections of these several laws appear on the bill of exceptions, to have been given in evidence.  The slaves, then, in this case would descend to the wife.  This point is ruled for the defendant.    Second.  The administration being granted in Missouri, and the property found here, it certainly, under our own laws, goes to the administrator to be by him disposed of as shall be directed by the laws of Kentucky.  This point is then ruled for the plaintiff. Third.  The defendant depends on his long and undisturbed possession.  Of all the cases cited by the defendant that of Brent *v.* Chapman is the strongest.  Chapman brought an action of trespass against Brent, for taking in execution on *fi. fa.* against the estate of Robert Alexander, deceased, a slave named Ben, claimed by Chapman as his property.  Judgment was given for the plaintiff, and on error that judgment was affirmed in the Supreme Court of the United States.  These are the facts of the case :  The slave was the property and in the possession of the late Robert Alexander, the elder, at the time of his death :  his sons, Robert and Walter S.,

were named executors of his will, but never qualified as such. On the 17th December, 1803, Walter S. took letters of administration with the will annexed. No division was ever made by the order of any Court of the personal estate of the deceased among his representatives, but previous to August, 1800, a parol division of the slaves was made ; Robert Alexander the younger, and Walter S. Alexander, the latter (52) being then under the age of 21 years, Robert A. being possessed of the slave and being taken on execution for debts due from himself in his individual character, in August, 1804, took the oath of insolvency under the laws of Virginia, and delivered up to the Sheriff the slave, as a part of his property included in his schedule. The Sheriff sold him at public sale, and the plaintiff knowing the slave to belong to the estate of the deceased, Robert Alexander, as aforesaid, became the purchaser for a valuable consideration, and took possession of the slave and continued in possession, under the sale and purchase, until July, 1806. Dunlap & Co. obtained judgment against Robert A., the younger, as executor of his father Robert A.; and upon *fi. fa.* issued on that judgment, the Marshal seized and took the slave as part of the estate of the testator R. A., there being no property belonging to the estate in the county, which could have been levied on, except what R. A., the younger had sold and disposed of for the purpose of paying his *own debts.* The Supreme Court of the U. S. decided that the possession of Chapman, the plaintiff, gave him a good title to maintain his action on the same principle that the defendant may protect himself, under that length of possession under the statute of limitations, notwithstanding there was no executor or administrator of the deceased to be sued, and the plaintiff knew the slave belonged to the estate of R. A., deceased, and not to R. A., the younger, for the payment of whose debts the slave was sold, when Chapman, the plaintiff, became the purchaser.

The Chief Justice, in delivering the opinion of the Court, said, the only objection of any weight, was, that there was no administration upon the estate of R. A., sen., and consequently, that the possession of Chapman was not adverse possession. But there was an executor competent to assent, and who did assent to the legacy and to the partition between the legatees, and who could not afterwards refuse to execute the will. We may further add, that the creditors of R. A., deceased, might, on the neglect of the executors, have taken out letters of administration. The case before this Court is somewhat different. Pogue, the intestate, died in Kentucky ; and in less than two months the widow removed to a distant country, before one could reasonably suppose there could have been any administration of the estate, agreeably to the laws of any civilized country. When this cause was before this Court on a former occasion, no evidence of the laws of Kentucky was preserved, and it was insisted, in argument, that ought not to entertain any sus- (53) picions against the rights of the defendant, because, for any thing known to the Court, administration might have taken place there in a very short time, or no administration might have been necessary ; but the Court then thought that enough had been proved to throw the burthen of proof on the defendants. In addition to the evidence before the Court at the May term of last year, there are now several statutes of the State of Kentucky, by which it appears that the widow of Pogue might probably be the legal owner of the slaves in question, after Pogue's death, and if so, the children would take under their father's will. The case of the defendants certainly appears more favorably now than it did at the former trial ; and this Court is so little disposed to disturb the long and uninterrupted possession

M'Donald *v.* Walton.

of property, that it would, perhaps, after such a length of possession as has been proved, have been inclined to leave it to a jury to presume an administration of Pogue's estate, had the widow remained even six months in Kentucky.   The authorities cited by the defendant all require that the title by possession should have been acquired without force or fraud; and although the possession of the defendant was acquired by lawful means, yet it must be remembered that his testator's right was derived through the widow of Pogue, and all claiming under her must be affected by her acts.   It is true, that if there be no debts due from Pogue, the widow, being probably entitled under the laws of Kentucky, to take the property, it would be very vexatious to pass over all this property to the administrator, merely to entitle him to his compensation, when the consequence will be, that all the estate must be again distributed among persons now holding it.   This case is put under the impression that Pogue may have no relations entitled to take before the widow.   If it were possible to suppose a man so mischievous as to be willing to undertake such an administration merely to harass the defendant, still we have no power to require him to give proof of the existence of any demands against the estate : but we are not justified in supposing so extraordinary a case may often exist; and where any latitude in the construction of laws is allowed, the Court must be guided by circumstances of more probable occurrence.   Should, however, the County Court, on the settlement of accounts of the administrator, find that there is reason to believe that he undertook the administration merely for the purpose of vexation, he is somewhat in the power of that Court.   It has the power of restricting him to very moderate compensation, and would probably do so.

(54) By the 29th section of an act of the General Assembly of the State of Kentucky, entitled an act directing the course of descents admitted by both parties in the bill of exceptions to be the law of Kentucky, negroes may be taken in execution for the payment of debts.   Without resorting to the decisions of the Kentucky Courts to show that the administrator would have the right to the slave of his intestate to satisfy debts, we are satisfied that our own laws would give the administrator the disposition of any of Pogue's property which by the law of Kentucky is subject to execution to pay his debts.   It has been contended also that our law allowing letters of administration on the estate of persons dying abroad being passed long since Pogue's death, cannot act retrospectively so as to give the administrator a right to the property of Pogue.   This argument appears to be entitled to very little authority.   Administration is not granted to advance the interest of the administrator.   It is done for the purpose of securing the property of the deceased to the rightful owners ; and the administration of an estate is so troublesome an office, that it is very seldom sought after by well disposed persons : and the community is under obligations to any honest man that will undertake such an office.   Suppose for an instant that there never had been any law in Missouri to authorize letters of administration on the estates of intestates ; and that the Legislative body in actual session should pass such a law as we have now in force, would it be reasonable to suppose that the estate of a man who died yesterday intestate, should be the prey of any unprincipled person who might choose to seize on it, while an infant orphan might be left without the means of subsistence.   The right of the administrator in such a case could not divest that of the legal heirs, but would be in support of them.   This point, then, is ruled for the plaintiff.

The plaintiff's first. instruction seems, then, to have been rightly refused. His second instruction was of so general a character as not to be necessary in this case, and if necessary, it would have been, perhaps, properly given against him. His third instruction should have been given. The first instruction prayed for by the defendant was properly given; but the second should have been refused.

The judgment of the Circuit Court is reversed, and the cause must be sent back for further proceedings.

WASH, J., dissenting.

I dissent from the opinion given above, upon the ground that the possession of the defendant (from analogy to the statute of limitations) should not be divested by administration.